Strafford
No. 88-219

## Town of Barrington

v.

## John Gadd, Nancy Gadd, and Jonathan Milne

January 31, 1990

*McNeill, Taylor & Dolan P.A.*, of Dover (*Michael P. Murphy* on the brief, and *Malcolm R. McNeill, Jr.*, orally), for the plaintiff.

*Charles H. Morang*, of Concord, by brief and orally, for the defendants.

THAYER, J.   In this gravel pit case, a trial to the Master (*R. Peter Shapiro*, Esq.) resulted in a finding that the defendants' mineral extraction operation was in violation of both local ordinance and State statute. Consequently, the master recommended, and the Superior Court (*Contas*, J.) ordered, that the defendants, John Gadd, Nancy Gadd, and Jonathan Milne, be permanently enjoined from excavating beyond a designated three-acre area unless and until all requisite approvals and permits are obtained. It also ordered that the defendants cause the property to be reclaimed. In addition, the defendants were fined $8,900 (although the money was to be held in escrow and they were given the right to petition for abatement in twelve months) and were ordered to pay the Town of Barrington's costs and reasonable legal fees incurred in connection with the litigation. The defendants appeal to this court, raising a number of issues for our consideration. We find their arguments unpersuasive and, for the reasons that follow, affirm.

Although the defendants raised eleven specific questions in their notice of appeal, they briefed only five. At oral argument, after conceding that our recent decision in *Town of Wolfeboro v. Smith*,

131 N.H. 449, 556 A.2d 755 (1989) was dispositive of a number of the issues actually briefed, the defendants limited their arguments on appeal to three. Choosing to focus only on the State law issue, the defendants claim that their activities relevant to mineral extraction satisfy the three-part test delineated in *Wolfeboro*, and therefore entitle them to continue mining pursuant to the grandfather clause of RSA chapter 155-E. They further claim that the $8,900 fine levied against them, coupled with an award of costs and legal fees, is confiscatory in nature and "smacks of a contempt finding." Finally, the defendants claim that the master erred in limiting testimony concerning the issue of bias.

The relevant facts pertaining to the issues at hand are as follows. In the summer of 1978, John Gadd, having sold his fuel oil business, was interested in investing some of the proceeds in real estate. He discussed possible investment opportunities with Jonathan Milne, a former business acquaintance, and Milne suggested that Gadd purchase the property currently at issue in this case. Mr. Gadd bought the property from Barry and Lynda Lazaro on August 14, 1978. He retained title to the premises until October 28, 1985, when he conveyed the property to his wife, Nancy Gadd.

The property, located in the town of Barrington, consists of approximately 120 acres containing a house and various outbuildings. It is divided into two unequal parcels by Oak Hill Road North. Roughly ninety acres of this land lie to the west of the road, while the remaining approximately twenty-eight acres lie to the east of the road. The present dispute involves only twenty-five of the twenty-eight acres situated on the easterly side of Oak Hill Road North.

When Mr. Gadd purchased the property, it was decided that he and Mr. Milne would work in concert. Gadd acquired title to the property, but the carrying costs were to be paid by Milne. It was further agreed that Mr. Milne and his family would occupy the premises and, in lieu of rent, would improve the buildings and property. Any profits generated from the Milnes' use of the property were to be used to defray the operating and capital costs. Potential uses of the property were discussed and included, *inter alia*, the excavation of minerals.

Pursuant to his oral agreement with John Gadd, Milne began to improve the property. He had the water and septic systems repaired. He also had a small pond dug behind the house. In addition, he had a riding ring and exercise area developed. The excess fill from these projects, consisting primarily of loam and sand, was stockpiled on the premises. Some of these stockpiled

minerals were bartered for goods and services. Others were utilized by Mr. Milne on additional property in which he had an interest.

It was not until the spring of 1985 that the defendants began to discuss with the town the possibility of using the property for commercial excavation of sand and gravel. While the town advised the defendants that RSA chapter 155-E would have to be complied with and that zoning board and planning board approval would be required, the defendants maintained that they had a non-conforming use and therefore were entitled to continue excavations as authorized by the RSA chapter 155-E grandfather clause in Laws 1979, 481:3.

On May 15, 1986, Mr. Milne met with the board of selectmen. He explained that he was experiencing financial difficulties and asked permission to mine a portion of the property. Although they made no independent investigation as to the history of the use of the property or its current status, the selectmen agreed that Mr. Milne would be allowed to mine a three-acre parcel of the premises. There is no dispute between the parties as to the defendants' right to mine this limited area.

On or about July 1, 1986, defendants John Gadd and Nancy Gadd entered into a "lease-contract" with Dwight W. Sharp to allow him to remove sand and gravel from the subject premises. Although the agreement called for excavation of a twenty-five-acre tract of land, the financial terms of the arrangement were ultimately substantially changed in order to reflect the fact that excavation would actually be limited to the three-acre area referred to above. The defendants, however, did not confine their mining activities to this three-acre area; they proceeded to mine a portion of the property well outside the three-acre limit. In addition to Mr. Sharp's group, another firm, Fisher Excavation, started to extract minerals from beyond the designated limits sometime in May of 1987.

An on-site investigation of the property by the town road agent on May 19, 1987, revealed that minerals had been and were being extensively mined in areas well beyond the three-acre parcel. On July 14, 1987, a cease and desist order, demanding that they stop all excavation except within the delineated three-acre area, was served on the defendants. They ignored this order, and the town subsequently filed suit against them. This action resulted in a temporary restraining order being entered on August 5, 1987. Excavation in the disputed twenty-five-acre area did not stop, however, until August 17, 1987, at which time the town posted a $10,000 bond. After the five-day trial of this matter, the master found in favor of the plaintiff town.

Before reaching the specific issues raised on appeal, we pause briefly to note the applicable standard of review. Because "the master is in the best position to observe the parties, evaluate the evidence, and assign credibility to the testimony," *In re Adoption of Baby C.*, 125 N.H. 216, 225, 480 A.2d 101, 106 (1984), we will not disturb his findings "unless they are unsupported by the evidence or are erroneous as a matter of law," *Demetracopoulos v. Strafford Guidance Ctr.*, 130 N.H. 209, 213, 536 A.2d 189, 192 (1987). The master's findings are supported by the evidence when the record discloses "evidence from which a reasonable person could have made such findings," *Town of Plaistow v. Nadeau*, 126 N.H. 439, 442, 493 A.2d 1158, 1161 (1985); and, as long as the decision is supported by the evidence, "[t]his court will not substitute its judgment for that of the trier of fact," *N.H. Donuts, Inc. v. Skipitaris*, 129 N.H. 774, 779, 533 A.2d 351, 353 (1987). This is particularly true when, as here, "the trier of fact has bolstered his conclusions with a view." *N.H. Donuts*, 129 N.H. at 779, 533 A.2d at 353.

The master found that the defendants' mineral extraction operation was conducted not only in violation of the town of Barrington's zoning ordinance, enacted in 1972, but also in violation of State law; namely, RSA chapter 155-E, which pertains to the local regulation of excavations. We agree.

The defendants do not deny that RSA 155-E:2 (Supp. 1988) specifically mandates that "[n]o owner shall permit any excavation of earth on his premises without obtaining a permit." They also do not deny that, at all times relevant to this lawsuit, they failed to obtain the requisite permit. They argue, however, that their excavation operation existed and was in use on August 24, 1979, the effective date of the applicable legislation, and is therefore exempt from the permit requirement of RSA 155-E:2 (Supp. 1988). The defendants claim that they are authorized to continue their mining activities pursuant to the grandfather clause of RSA chapter 155-E, which specifically provides that

"[a]ny owner of an existing excavation in use as of the effective date of this act and which is subject to this act may continue such existing excavation without a permit but shall perform restoration in compliance with RSA 155-E:5 within a reasonable period following the intended cessation of the excavation or any completed section thereof."

Laws 1979, 481:3.

We recently had occasion to discuss and interpret this grandfather clause in the case of *Town of Wolfeboro v. Smith*, 131 N.H. 449, 556 A.2d 755. We held

"that a party who desires to continue excavation operations without a permit under RSA chapter 155-E must meet a three-pronged test: First, he must prove that excavation activities were actively being pursued when the law became effective; second, he must prove that the area that he desires to excavate was clearly intended to be excavated, as measured by objective manifestations and not by subjective intent; and, third, he must prove that the continued operations do not, and/or will not, have a substantially different and adverse impact on the neighborhood."

*Town of Wolfeboro v. Smith*, 131 N.H. at 457, 556 A.2d at 759. It is important to note that a town "requesting that a permit be obtained need only prove that excavations are ongoing and that no permit has been granted." *Id.* Once this is established, "the burden of proof shifts to the excavator to prove all three prongs" of the above-delineated test. *Id.* Therefore, in the present case, the defendants had the burden of proving that their mining activities satisfied the requirements set forth in *Wolfeboro* for invocation of the RSA chapter 155-E grandfather clause.

We recognize that the *Wolfeboro* case was not decided until March 6, 1989, and that the three-pronged test enunciated therein was not, as such, relied upon by the master. Based on this fact, the defendants urge us to remand the case so that it may be retried in light of *Wolfeboro*. We decline to do so because the issue of when excavation began was before the master, and, after a thorough and complete examination of the record, we conclude that there is ample evidence to support the master's conclusion that the defendants were not entitled to continue excavating pursuant to the grandfather clause.

The defendants have failed to prove the first prong of the mandatory three-part test, "that excavation activities were actively being pursued" on August 24, 1979. The master found that "[t]here was no ... active commercial mineral extraction pit on the subject property when purchased by John Gadd" in 1978. The testimony of both Ronald Landry and John Gadd support this determination. Mr. Landry explained that during the mid-to-late 1970's he mowed and hayed the fields on the subject premises. He testified that he never had any trouble cutting the fields due to any excavations on the site, and that, in fact, he never saw any excavations during the

two years from 1977 until 1979 that he hayed the property. Although Mr. Landry acknowledged that during the 1970's his familiarity with the area was limited to the fields on the property, Mr. Gadd also testified that there was essentially no evidence of mineral extraction on the premises at the time he purchased it. There was no gravel pit in the vicinity of the pond; there was no sand pit in the back field. At most, there may have been a small test pit on the property.

In 1979, the year RSA chapter 155-E became effective and the crucial year in terms of the non-conforming use issue, the master found that "[s]everal individuals including Mr. Guptil and Mr. Twombly took several hundred yards in total of loam" from the property. The record reflects that, in that year, Mr. Twombly took between fifteen and eighteen loads of loam from an area in the general vicinity of the riding ring. Since he used a seven-yard truck, he hauled away, at most, 126 cubic yards of loam. He took only loam, not sand, and only did so in 1979. In exchange for the material, Twombly rototilled the field by the pond. In addition, Philip Guptil took approximately 610 cubic yards of loam from the Gadd property in 1979. Mr. Milne testified that the bulk of the material taken by both Twombly and Guptil had been stockpiled as a result of the scraping for the riding ring and the digging of the pond.

The sporadic taking of insignificant quantities of material, evidenced by the fact that friends and acquaintances occasionally came onto the property and, with their own equipment, hauled away small amounts of minerals, simply does not constitute an excavation operation. The record before us supports the determination that there was no excavation, defined as "a land area which is used, or has been used, for the commercial taking of earth, including all slopes," RSA 155-E:1, II (Supp. 1988), on the Gadd property in 1979. Just because the defendants wish they had an active mineral extraction operation in August of 1979 does not make it so.

■ Having failed to prove that their excavation operation met even the first prong of the *Wolfeboro* test, the defendants are not entitled to continue their mining activities pursuant to Laws 1979, 481:3. Therefore, because they conducted a gravel pit operation on their premises without first obtaining the requisite permit, the defendants clearly violated RSA 155-E:2 (Supp. 1988).

We now turn our attention to the defendants' second argument on appeal, that an order to pay the town's costs and legal fees of approximately $14,000, coupled with a fine of $8,900, is confiscatory

in nature and "smacks of a contempt finding." This argument need not detain us long.

■ The award of costs and attorney's fees in this case was not a matter left to the discretion of the trial court. RSA 155-E:10 (Supp. 1988) entitled "Enforcement," provides that

"[t]he regulator ... may seek an order from the superior court that the violator cease and desist from violation of any provision of ... this chapter [RSA chapter 155-E] and take such action as may be necessary to be in compliance with ... this chapter."

RSA 155-E:10, II (Supp. 1988). It further mandates that "[i]f the superior court issues such an order the regulator ... *shall have judgment for all costs and attorney fees in seeking such an order.*" *Id.* (emphasis added). The defendants do not challenge the authority of this statute, nor do they question the reasonableness of the legal fees. Apparently, they are just surprised and disappointed by the amount of the resulting bill. This hardly constitutes a legally cognizable ground for appeal, and merits no further consideration by this court.

■ Not only is the town clearly entitled to recoup the costs and legal fees resulting from this litigation in the superior court, it is also entitled to recoup those incurred in connection with this appeal. The statute dictates that the town is entitled to recover *all* of its costs and attorney's fees in seeking the cease and desist order. The phrase "all of its costs and attorney fees" encompasses those generated during the appellate process. After all, a victory at the superior court level, once appealed, is at most a hollow one until affirmed by the supreme court. We therefore conclude that the "seeking" referred to in the statutory phrase "seeking such an order" necessarily includes whatever appellate action is necessary to make that order effective. While the superior court can determine the amount of costs and attorney's fees before it, *Town of Goffstown v. Thibeault*, 129 N.H. 454, 462, 529 A.2d 930, 935 (1987), we will determine the costs and fees incurred in this court.

The defendants are apparently equally upset with the amount of the fine levied against them. The master found that they had been in violation of Barrington's zoning ordinance for 178 days. Having found that the defendants violated the ordinance, the master was authorized by law to impose a fine. Pursuant to Article Four of the ordinance, which provides for a fine of not more than fifty dollars a day for each day of noncompliance, the defendants were fined $8,900 ($50 per day for 178 days). Although their position is

unclear, it appears that the defendants contend that the master was not justified in assessing the maximum possible fine against them. We disagree.

■ The master found that the defendants were well aware of the risks they were taking by continuing to excavate beyond the designated boundary. They simply ignored the directives and suggestions of the town and caused the property to be excavated in areas prohibited by local ordinance and State statute. They did so at a time, and in a location and manner, which tended to obscure the activity from the town. As Mr. Milne stated at trial, they admittedly chose to "roll the dice," thereby risking fines while making tens of thousands of dollars in the process. The fact that their gamble resulted in a fine of $8,900 is of no moment. This amount is amply justified by the record and authorized by law.

The defendants' final argument consists of a one-sentence, conclusory statement contained in their brief which contends that "[d]espite the accumulation of evidence of discrimination against these Defendants, the Master refused to consider the issue and at one point excluded all further evidence." At oral argument, the defendants again complained that the master limited the introduction of evidence relative to bias, mentioning only that they were not permitted to call the plaintiff's counsel as a witness in the case. While it is true that Mr. McNeill did not testify, the defendants fail to present any argument whatsoever on the issue of whether the master's decision in this regard was error.

Although it is again unclear from the defendants' comments, they are also evidently referring to the master's decision to exclude a restoration plan estimate from evidence. The master had previously ruled that the defendants were foreclosed from raising issues relative to a variance application which was before the planning board at the time of this litigation. He reasoned that any events having transpired since the commencement of the litigation had no bearing on the question of the town's conduct before the issuance of the injunction and prior to the filing of the variance application. He further noted that the issue of bias before him involved the board of selectmen, a separate body from that of the planning board involved with the variance application procedure. Consistent with his earlier ruling, the master sustained the town's objection to the admissibility of the restoration plan estimate on the grounds of relevancy and hearsay. The defendants do not argue on appeal that the master's ruling was incorrect; apparently, they are just unhappy with it.

We also note that contrary to the defendants' assertion, the master did consider the issue of bias. He allowed the defendants broad latitude in presenting evidence on this issue. He specifically found, however, that the town at all times relevant to this proceeding "dealt with the defendants in a fair and forthright manner." Because there is ample evidence in the record to support this conclusion, we will not disturb the master's finding.

For all of these reasons, the decision of the trial court in this case is affirmed.

*Affirmed.*

All concurred.